IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

SAMUEL CANADA,                    )
        Plaintiff,              )
                                )        Civil Action No. 4:14cv00015
v.                                )
                                )
CAROLYN W. COLVIN,                )
Acting Commissioner,              )        By:    Joel C. Hoppe
Social Security Administration,   )        United States Magistrate Judge
        Defendant.              )

## REPORT AND RECOMMENDATION

Plaintiff Samuel Canada asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). On appeal, Canada challenges only the Commissioner's finding at step two that his diabetes and obesity were not severe impairments. Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and should be affirmed.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

2

whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Canada protectively filed for DIB and SSI in June 2011. *See* Administrative Record ("R.") 73, 80. He was 50 years old, *id.*, and had worked most recently as a parts puller in a junkyard, R. 247–48. Canada alleged disability beginning January 1, 2010, due to diabetes. R. 247. The state agency denied Canada's applications in August 2011 and again in October 2011. R. 88–98, 106–07. Both of the state-agency consultants who reviewed Canada's medical records concluded that his diabetes was a non-severe impairment. *See* R. 77, 79, 94, 96.

Canada appeared with counsel at a hearing before an ALJ on September 21, 2012. *See* R. 27. He testified about his "uncontrollable" diabetes and the limitations that condition caused in his daily activities. *See* R. 35–61. A vocational expert ("VE") also testified as to Canada's ability to return to his past work or to perform other work existing in the economy. *See* R. 62–71.

The ALJ denied Canada's applications in a written decision dated October 29, 2012. R. 12–22. He concluded at step two that Canada was not disabled because he was not severely impaired by diabetes and obesity. *See* R. 15, 16–19. The ALJ, however, made alternative findings through step five. *See* R. 20–22. Assuming Canada had a severe impairment or combination of impairments, the ALJ found that Canada had the residual functional capacity ("RFC") to perform light work that did not involve "concentrated exposure to extreme heat and

3

cold" or require climbing ladders, ropes, or scaffolds.[1] R. 20. Relying on the VE's testimony, the ALJ concluded at step four that Canada still could perform his past work as a "toe puller," R. 21, *i.e.*, someone who assembles shoes, R. 49, 69. The ALJ also concluded at step five that Canada could perform other light jobs identified by the VE, such as custodian, production inspector, and hand packer. R. 21–22. The Appeals Council declined to review the ALJ's decision, R. 1, and this appeal followed.

### III. Facts

A. *Treatment Records*

Canada has a history of diabetes and "non-compliance induced" diabetic ketoacidosis.[2] R. 299. On July 10, 2010, Canada went to the emergency room because he had experienced excessive thirst and frequent urination over the past two weeks. R. 401. He reported being diagnosed with diabetes "several years" earlier, but explained that he had been off insulin for about seven years because his blood sugar was "normal" after he "lost a lot of weight."[3] *Id.* Dr.

---

[1] "RFC" is a claimant's maximum ability to work "on a regular and continuing basis" despite his or her impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the claimant's record and must reflect the "total limiting effects" of his or her impairments. 20 C.F.R. §§ 404.1545, 416.945. "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting or carrying objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can lift twenty pounds (and frequently lift ten pounds) can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

[2] A person with diabetes has too much glucose in his blood. Mayo Clinic, *Diabetes*, http://www.mayoclinic.org/diseases-conditions/diabetes/basics/definition/con-20033091 (rev. July 31, 2014). "Diabetic ketoacidosis is a serious complication of diabetes that occurs when [the] body produces high levels of blood acids called ketones" because it is not producing enough insulin. Mayo Clinic, *Diabetic Ketoacidosis*, http://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/basics/definition/con-20026470 (rev. Oct. 23, 2012). Symptoms include excessive thirst, frequent urination, abdominal pain, nausea or vomiting, weakness, and fatigue. *See id.* The condition can be fatal if untreated. *See id.*

[3] Earlier medical records indicate that Canada was diagnosed with diabetes in March 2002, when he was hospitalized with diabetic ketoacidosis. R. 429. Canada was again hospitalized with

James McCubbin, M.D., noted that Canada's history suggested "asymptomatic hyperglycemia." *Id.* Blood tests showed Canada's glucose level at 494 mg/dL, well above the normal range of 65–140 mg/dL. *See* R. 403. Dr. McCubbin administered intravenous insulin and discharged Canada home in stable condition a few hours later. *See* R. 402, 404. He also prescribed two non-insulin antidiabetic medications and instructed Canada to find a primary care provider. R. 405.

Canada returned to the emergency room on August 3, 2010, complaining of hyperglycemia, excessive thirst, frequent urination, and weakness. *See* R. 369, 372. He denied headaches, blurry vision, dizziness, or fatigue. R. 369, 375–76. Physical and neurological exams were also normal. R. 369–70, 372–73, 375–76. Canada reported that his blood-sugar levels were "poorly controlled" on his current medications. R. 375. Lab tests showed Canada's blood-sugar level at 624 mg/dL with 12.5% A1c.[4] *See* R. 370, 380–81.

Dr. Victor Mihal, D.O., diagnosed diabetic ketoacidosis and admitted Canada to the intensive-care unit. *See* R. 369–70, 376, 382. Dr. Mihal also substituted an insulin drip for

---

diabetic ketoacidosis in October 2003. *See* R. 427. He reported that he stopped taking his insulin about six months earlier. *Id.* The discharging physician instructed Canada to restart his insulin and other diabetic medications. *See* R. 428. There are no relevant medical records dated between October 2003 and July 2010.

Medical records indicate that Canada lost 57 pounds between spring 2002 and summer 2010. *Compare* R. 429 (334 lbs), *with* R. 400 (277 lbs). In March 2002, a physician noted that Canada should weigh about 184 pounds. R. 429.

[4] The A1c test is used to gauge how well a patient is managing his diabetes overall. *See* Mayo Clinic, *A1c Test: Definition*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/prc-20012585 (rev. Jan. 30, 2013). Results reflect the patient's estimated average blood-sugar level for the past two or three months by measuring the percentage of hemoglobin coated with sugar. *See id.* "The higher [an] A1c level, the poorer [the] blood sugar control and the higher [the] risk of diabetes complications." *Id.*

In January 2012, Canada's treating endocrinologist noted that his A1c should be less than 7%, R. 525, which denotes an estimated average blood-sugar level of 154 mg/dL, *see* Mayo Clinic, *A1c Test: Results*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (rev. Jan. 30, 2013). An A1c level of 12.5% denotes estimated average blood-sugar levels between 298 mg/dL and 326 mg/dL. *See id.*

Canada's non-insulin antidiabetic medications.[5] *See* R. 366. Canada was discharged in stable condition on August 7, 2010. R. 366, 368. A physician instructed Canada to discontinue his non-insulin medications, start Lanuts and Novolog insulin, follow a diabetic diet, and establish care with Halifax Primary Care. *See* R. 366. He also gave Canada a free AccuCheck monitor and contact information for Med Assist to help him get his insulin at little or no cost. *Id.*

The rescue squad delivered Canada to the emergency room on December 4, 2010. R. 346. He reported hyperglycemia, "some blurry vision," weakness, and numbness in both arms for the past three days. R. 347. Canada had not taken his insulin in two weeks. R. 342, 347. Physical and neurological exams were normal. *See* R. 342, 348. Lab tests showed Canada's blood-sugar level at 494 mg/dL with 13% A1c.[6] *See* R. 353, 344. Dr. William Bell, M.D., noted that Canada was "poorly compliant" with his insulin regimen, and would be admitted to the ICU with an insulin drip to treat diabetic ketoacidosis. R. 347.

---

[5] Canada's blood-sugar levels remained high during his hospitalization:

      August 3: 468–624 mg/dL
      August 4: 232–363 mg/dL with 12.7% A1c
      August 5: 341–431 mg/dL
      August 6: 189–424 mg/dL
      August 7: 313–335 mg/dL

*See* R. 384–85, 386–87, 396.

[6] An A1c level of 13% denotes an estimated average blood-sugar level of 326 mg/dL over the past two or three months. *See* Mayo Clinic, *A1c Test: Results*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (rev. Jan. 30, 2013). Canada's blood-sugar levels fluctuated between normal and above-normal limits during this hospitalization:

      December 5: 136–460 mg/dL
      December 6: 74–329 mg/dL
      December 7: 45–244 mg/dL
      December 8: 94–303 mg/dL
      December 9: 78–229 mg/dL

*See* R. 339, 352–53, 362–63. Canada's "glycemic control was much improved" upon discharge. R. 339.

Dr. Tessie Otero-Truitt, M.D., provided a diabetic consult on December 5, 2010. R. 344–45. Canada reported that he stopped taking his insulin because it made him sick. R. 344. Dr. Otero-Truitt instructed the staff to wean Canada off the insulin drip and start his new home insulin regimen. R. 345. Canada was discharged in stable condition on December 9, 2010. *See* R. 339. Dr. Jonathan Lenzen, M.D., instructed Canada to follow a diabetic diet, exercise, and take his insulin as prescribed. *Id.* He also gave Canada enough insulin to take until his appointment with Med Assist the next morning. *See id.* Dr. Lenzen noted that Canada's inability to pay for insulin was "part of the reason" he came to the emergency room with diabetic ketoacidosis. *Id.*

Canada saw Dr. Otero-Truitt as scheduled on December 17, 2010. R. 304–05. He reported taking his insulin and testing his blood-sugar levels, which generally ranged between 180 mg/dL and 260 mg/dL. *See* R. 304. Canada also reported blurry vision, excessive thirst, edema, and hip pain. *Id.* He denied fatigue, dizziness, and generalized weakness, and reported having normal activity and energy levels. *Id.* On exam, Dr. Otero-Truitt noted only that Canada's extremities were slightly edematous. R. 305. She instructed Canada to increase his insulin and return in three months. *Id.* In the meantime, Canada was supposed to report his blood-sugar levels to the office in case Dr. Otero-Truitt needed to adjust his insulin. *See* R. 305. Dr. Otero-Truitt considered Canada's diabetes "uncontrolled" at that time. *See id.*

Canada returned to Dr. Otero-Truitt's office on March 30, 2011, complaining of headaches, blurred vision, fatigue, and leg numbness. R. 302. He was not checking his blood-sugar levels as instructed, and he did not say whether he was taking his insulin as prescribed. *Id.* In-office lab tests showed Canada's blood-sugar level at 315 mg/dL. *See id.* Physical and neurological exams were normal. R. 302–03. Dr. Otero-Truitt instructed Canada to increase his insulin and return in three months. R. 303. She also reminded Canada to report his blood-sugar

7

levels to her office in case his insulin needed to be adjusted in the meantime. *See id.* Dr. Otero-Truitt still considered Canada's diabetes to be "uncontrolled" on this visit. *Id.*

The rescue squad delivered Canada to the emergency room with hyperglycemia on June 13, 2011. R. 321. Canada had not taken his insulin in three days. *Id.* Lab tests showed Canada's blood-sugar level at 853 mg/dL with 14.7% A1c.[7] R. 316, 324. Dr. Robert Durr, M.D., noted that Canada's "completely irresponsible" non-compliance with his insulin regimen had again caused diabetic ketoacidosis. R. 315–16. Dr. Durr admitted Canada to the ICU with an insulin drip. *See* R. 316. He also arranged a meeting for Canada with social services, which he cautiously hoped would prevent another "totally unnecessary" hospitalization. *Id.* Dr. Durr expressed frustration that Canada "didn't try" to refill his insulin and had not taken advantage of available community resources. R. 315, 316.

Dr. Otero-Truitt saw Canada in the ICU on June 13. *See* R. 318–19. Canada told Dr. Otero-Truitt that he never contacted Med Assist and had not taken insulin since running out three days earlier. *See* R. 318. He reported excessive thirst and urination, but denied blurry vision, dizziness, fatigue, weakness, or pain or swelling in the extremities. *See id.* Physical and neurological exams were normal. R. 318–19. The next day, Canada was transferred from the ICU to the floor for "close monitoring" and diabetes education. R. 312. He was discharged in stable condition on June 16, 2011. *See id.* The discharging physician gave Canada contact information

---

[7] An A1c level of 14.7% denotes estimated average blood-sugar levels above 355 mg/dL over the past two or three months. *See* Mayo Clinic, *A1c Test: Results*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (rev. Jan. 30, 2013). Canada's blood-sugar levels fluctuated between below-normal and above-normal limits during this hospitalization:

> June 13: 181–853 mg/dL
> June 14: 25–272 mg/dL
> June 15: 137–336 mg/dL
> June 16: 49–188 mg/dL

*See* R. 333–35.

for Med Assist, "stressed the importance of compliance with his insulin," and encouraged him to find a primary-care provider. R. 312–13.

Canada returned to Dr. Otero-Truitt's office on September 19, 2011, complaining of headaches, blurred vision, and heat intolerance. R. 419. He denied dizziness, fatigue, general weakness, numbness, and swelling in his extremities. *See id.* Canada had run out of insulin a week earlier, and he was not checking his blood-sugar levels as instructed. *Id.* Physical and neurological exams were normal. *See* R. 419–20. Dr. Otero-Truitt refilled Canada's insulin and instructed him to return in four months. R. 420. She again reminded Canada to report his blood-sugar levels to her office in case she needed to adjust his insulin. *See id.* Dr. Otero-Truitt still considered Canada's diabetes to be "uncontrolled" on this visit. *Id.*

Canada was briefly hospitalized with chest pain on January 18, 2012. *See* R. 439, 447, 515. He reported blurred vision, R. 508, but denied persistent dizziness, fatigue, and pain or swelling in his extremities, R. 445. His glucose level on admission was 166 mg/dL. R. 441, 448. Physical exams and cardiac diagnostic studies were generally unremarkable. *See* R. 441, 442–43, 446, 459. Canada was discharged that evening after being counseled to quit smoking tobacco, using cocaine, and drinking alcohol. *See* R. 443.

Canada returned to Dr. Otero-Truitt's office on January 19, 2012. R. 523. He reported taking insulin without side-effects and checking his blood-sugar levels, which generally ranged between 220 mg/dL and 300 mg/dL. *Id.* Canada was "not taking the prescribed amount of insulin," however, because it caused his blood sugar to drop too low. *Id.* Canada reported experiencing headaches, blurred vision, weakness, and swelling in his extremities. He denied fatigue, dizziness, or temperature intolerance. *See* R. 523–24.

9

Labs drawn in the office showed Canada's blood-sugar level at 359 mg/dL with 14.1% A1c.[8] *See* R. 431–32. Physical and neurological exams were normal. R. 524–25. Dr. Otero-Truitt increased Canada's insulin and counseled him on the importance of taking his medications as prescribed. R. 525–26. She noted that Canada's A1c level should be less than 7%. Dr. Otero-Truitt also encouraged Canada to exercise regularly and follow a diabetic diet. *See id.* She instructed him to call the office to report his glucose levels in case she needed to adjust his insulin and to return in two months for routine labs. *See id.*

B.    *Medical Opinions*

On August 24, 2011, state-agency medical consultant Dr. James Wickham reviewed Canada's medical records available through August 17, 2011. *See* R. 73–79, 80–86. He opined that Canada's diabetes was non-severe because it responded well to treatment. *See* R. 76, 77, 79. Dr. Wickham also agreed with Dr. Durr's opinion that Canada's diabetes "would not be a problem" if he followed his treatment plan. R. 78. State-agency medical consultant Dr. David Williams, M.D., reviewed the same medical records on October 13, 2011. *See* R. 90–97, 98–105. Dr. Williams opined that Canada's diabetes was non-severe because it had responded well to treatment and there was no new medical evidence supporting Canada's claims that his diabetes was "getting worse" or "not being controlled with insulin shots." R. 92–94, 101–03. Neither Dr. Wickham nor Dr. Williams provided an RFC assessment. *See* R. 78, 85, 95, 103.

---

[8] Labs drawn in the hospital on January 18, 2012, showed that Canada's blood-sugar levels fluctuated between 59 mg/dL and 366 mg/dL throughout the day. *See* R. 455. An A1c level of 14.1% denotes estimated average blood-sugar levels slightly above 355 mg/dL over the past two or three months. *See* Mayo Clinic, *A1c Test: Results*, http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (rev. Jan. 30, 2013).

C.    *Canada's Statements*

Canada completed an Adult Function Report and Pain Questionnaire on July 11, 2011. *See* R. 215–28. He reported that he spent his days watching television and walking around. R. 215. Canada reported no problems tending to his personal needs, making simple meals, cleaning his room, or doing laundry. R. 217. Canada reported that "poor vision" and weakness affected his ability to stand, walk, lift, reach, climb, complete tasks, and concentrate, among other things. *See* R. 222. However, he also reported that he could "lift at least 100 lbs and walk 1½ mile." *Id.* Canada reported experiencing aching, burning, throbbing pain in his hip and head "sometimes daily" and "sometimes [every] 2–3 days." R. 227. He did not identify any particular medication side effects. *See* R. 228.

In September 2012, Canada testified that he cannot control his diabetes even though he takes his insulin as prescribed. *See* R. 35–37. He reported experiencing blurry vision, fatigue, dizziness, headaches, and generalized weakness. *See* R. 35, 36, 40. He also reported feeling shaky when his blood sugar drops too low, which happens "two to three times a week." R. 38. Canada testified that he cannot return to his past work as a "parts puller" because he cannot sit or stand for more than 30 minutes at one time and his legs "give out" when he tries to lift 100 pounds. *See* R. 39–40. He also testified that he weighed 320 pounds "about three or four months before" he was first hospitalized in summer 2010. *See* R. 52–53. Canada did not attribute any particular functional limitations to his current weight. *See* R. 35–38, 39, 40, 52–53.

## IV. Discussion

Canada challenges only the ALJ's finding at step two that his diabetes and obesity were non-severe impairments. *See generally* Pl. Br. 15–22, ECF No. 15. He argues that the ALJ misinterpreted the medical evidence, as well as his own "credible" statements describing the

11

limiting effects of his "uncontrollable" diabetes. *See id.* at 15, 16, 18, 20. Canada also argues that the ALJ did not consider the combination of diabetes and obesity in his severity analysis. *See id.* at 18. He does not challenge the ALJ's alternative conclusions that, assuming Canada is severely impaired by diabetes or obesity, he still can perform certain jobs identified by the VE. *See generally id.* at 14, 15–22.

A.    *Non-Severe Impairment*

At step two, the claimant must show that he suffers from a "severe medically determinable physical or mental impairment . . . or combination of impairments." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). This requires the ALJ to determine whether the claimant has a "physical or mental impairment" and, if so, the degree to which that impairment affects the claimant's physical or mental ability to perform "basic work activities." SSR 96-3p, 1996 WL 374181, at *1–2 (July 2, 1996) (citing 20 C.F.R. §§ 404.1520, 416.920). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), or "objective medical evidence,"[9] 20 C.F.R. §§ 404.1529(a), 416.929(a). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," such as seeing, sitting, and standing. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ's severity analysis must take into account all medical and related evidence in the claimant's record. *See* SSR 96-3p, at *1–2; 20 C.F.R. §§ 404.1529(c)(4), (d)(1),

---

[9] Objective medical evidence is defined by regulation as "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a).

416.929(c)(4), (d)(1); 20 C.F.R. §§ 404.1520(c), 416.920(c). Symptoms, such as fatigue, will not be found to cause functional limitations unless the claimant "first establishes by objective medical evidence that he or she has a medically determinable physical or mental impairment(s) [that] . . . could reasonably be expected to produce the alleged symptoms." SSR 96-3p, at *2. If the claimant clears this threshold, then "the intensity, persistence, and limiting effects of the alleged symptom(s) must be considered along with the objective medical and other evidence in determining whether the impairment . . . is severe." *Id.*

An impairment should be labeled "not severe only if it is a *slight abnormality* which has such a *minimal effect* on the [claimant] that it would not be expected to interfere" with a person's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted); *Waller v. Colvin*, No. 6:12cv63, 2014 WL 1208048, at *7 (W.D. Va. Mar. 24, 2014); SSR 96-3p, at *1. This is not a difficult hurdle for the applicant to clear. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999); SSR 96-3p, at *2. Still, this Court must affirm the ALJ's non-severity finding if he applied the correct legal standard and his finding is supported by substantial evidence in the record. *See Meyer*, 662 F.3d at 704; *Owens v. Barnhart*, 400 F. Supp. 2d 885, 891 (W.D. Va. 2005).

1. *The ALJ's Findings*

The ALJ found that diabetes and obesity were medically determinable impairments that "could reasonably be expected to produce some symptoms of the general type that [Canada] alleged," but that Canada's description of his symptoms' intensity, persistence, and limiting effects was "not credible" compared to the longitudinal record. R. 15, 16. The ALJ gave several reasons for rejecting Canada's "allegations regarding the severity of his limitations." R. 18.

Case 4:14-cv-00015-JLK-JCH   Document 18   Filed 03/18/15   Page 13 of 24   Pageid#: 618

First, the ALJ cited several instances where Canada admitted not taking his insulin. *See* R. 17–18. He noted that Canada had twice been hospitalized with diabetic ketoacidosis "solely due to noncompliance," R. 17, and that Canada enjoyed "reasonably good health" when he follows his doctors' orders, R. 18. Canada's treatment record did "not establish that [he was] so limited that he cannot work at all." *Id.* Second, the ALJ found significant gaps in Canada's treatment after his January 1, 2010, alleged disability onset date. *See* R. 16–17, 18. Third, the ALJ found that the state-agency reviewers' non-severity findings were "consistent with the other credible evidence" in the current record. R. 19–20. Finally, the ALJ found that Canada had made several inconsistent statements and "acted inconsistently for one who is asserting that he is completely disabled." R. 18.

2. *Analysis*

Substantial evidence does not support the ALJ's conclusion that Canada's diabetes was a non-severe impairment. The ALJ based that conclusion primarily on his finding that Canada's diabetes could be controlled with insulin. *See* R. 18. Evidence that a medical condition resolves with appropriate treatment can support a finding that it is not a severe impairment. *See Edmunds v. Colvin*, No. 4:12cv51, 2013 WL 4451224, at *4 (W.D. Va. Aug. 16, 2013). Here, however, lab results consistently showed that Canada's glucose levels were above normal even on intravenous insulin. *See* R. 333–35, 339, 352–53, 362–63, 384–85, 386–87, 396, 455. Dr. Otero-Truitt also repeatedly increased Canada's self-administered insulin because his diabetes was "uncontrolled" on lower doses. R. 303, 305, 420, 526.

Of course, lab results and diagnoses are not evidence that Canada's diabetes caused more than minimal functional limitations as required for it to be considered a severe impairment. SSR 96-3p, at *2; *cf. Price v. Barnhart*, No. 7:04cv741, 2005 WL 3477547, at *6 (W.D. Va. Dec. 13,

2005) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1458 (4th Cir. 1990)) ("The mere diagnosis of a condition is not conclusive; any impairment must be accompanied by functional limitations that render the claimant unable to work."). The record contains evidence that Canada's diabetes could minimally interfere with his ability to perform basic work activities—like seeing or standing— even when he takes his insulin as prescribed.[10] *See* R. 37–40, 304, 523. In September 2012, for example, Canada testified that he experiences dizziness, fatigue, general weakness, headaches, and blurry vision. *See* R. 37–40. Canada also reported experiencing blurry vision and weakness during a visit with Dr. Otero-Truitt in January 2012. *See* R. 523–24.

 The Commissioner argues that Canada's statements cannot provide a basis for finding that his diabetes is a severe impairment because the ALJ properly discredited those statements. *See* Def. Br. 10, ECF No. 17. Certainly, a claimant's non-compliance with medical treatment can undercut his subjective complaints and other evidence of a severe impairment. *See, e.g.*, *Martinez v. Colvin*, No. 12cv986, 2014 U.S. Dist. LEXIS 33866, at *24–25 (D. Colo. Mar. 14, 2014); *Beshatova v. Astrue*, No. C09-5658, 2010 U.S. Dist. LEXIS 128227, at *12–14 (W.D. Wash. Nov. 12, 2010). In this case, however, the ALJ appears to have applied the wrong standard when evaluating Canada's credibility at step two. *See* R. 18. The ALJ twice explained that the record did not support Canada's allegations that he is "completely disabled" or "so limited that he cannot work at all." R. 18. This is too demanding a standard to apply at step two. *See* SSR 96-3p, at *2; *Hair v. Astrue*, No. 5:10cv309-D, 2011 WL 2681537, at *5 (E.D.N.C. June 16, 2011) ("Given the different nature of the step-two severity analysis and the RFC assessment, they are subject to different standards and requirements."). Thus, the ALJ did not

---

[10] Canada did not attribute any specific functional limitations to his obesity. *See* R. 35–38, 39, 40, 52–53.

15

evaluate whether Canada's diabetes caused more than minimal functional limitations—the proper legal standard.

Nevertheless, because the ALJ made alternative findings through step five, this Court's examination of the Commissioner's final decision also need not stop at step two. Courts review errors in social security cases to determine whether they could have changed the Commissioner's final decision that the claimant is not disabled. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) ("[A]ny error is reviewed under the harmless error doctrine. Thus, if the decision 'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.'") (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)); *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (explaining that the Fourth Circuit does not require procedural perfection and finding that the claimant did not identify any "evidence not considered by the Commissioner that might have changed the outcome of his disability claim"); *Kersey v. Astrue*, 614 F. Supp. 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."). Errors at step two may be harmless when the ALJ considers the effects of all of the claimant's impairments when making his RFC determination. *See Brooks v. Astrue*, No. 5:10cv104, 2012 WL 1022309, at *11 (W.D. Va. Mar. 26, 2012).

Canada's case is unusual because the ALJ completed steps three, four, and five even after concluding at step two that Canada did not have a severe impairment. *See R.* 19, 20–22. Indeed, the ALJ fully considered the combined limiting effects of Canada's diabetes and obesity at the later steps just as he would have if he found at least one severe impairment at step two. *See R.* 17–18, 19–20. In his RFC analysis, the ALJ properly accommodates those impairments and

symptoms to the extent that he found Canada's complaints were consistent with the medical and other evidence in his record. *See id.* Notably, Canada does challenge the ALJ's findings at steps three, four, or five. *See generally* Pl. Br. 14, 15–22.

B.      *Canada's Credibility*

Canada also argues that substantial evidence does not support the ALJ's credibility finding. *See* Pl. Br. 16, 18, 20. The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as fatigue, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. §§ 404.1529, 416.929). The ALJ must first determine whether the objective medical evidence shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of symptom alleged. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 594–95. If the claimant clears this threshold, the ALJ must then evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they affect his ability to work. SSR 96-7p, at *2; *see also Craig*, 76 F.3d at 595.

The latter analysis may require the ALJ to determine "the degree to which [the claimant's] statements can be believed and accepted as true" given the objective medical and other relevant evidence in the record. SSR 96-7p, at *2, *4. The ALJ cannot reject the claimant's subjective description of his symptoms "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006). Rather, he must consider "all the available evidence" in the record, including the claimant's statements, his treatment history, and the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c).

17

The ALJ must give specific reasons "grounded in the evidence" for the weight assigned to a claimant's statements. *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) (citing SSR 96-7p, at *4). A reviewing court will defer to the ALJ's credibility determination except in "exceptional circumstances." *Bishop*, 583 F. App'x at 68 (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011.

Canada testified that he suffers "uncontrollable" diabetes and debilitating blurry vision, headaches, dizziness, fatigue, and weakness even though he takes his insulin as prescribed. *See* R. 16, 18, 35–40. The ALJ found that Canada's diabetes and obesity "could reasonably be expected to produce some symptoms of the general type that [Canada] alleged," but that Canada's subjective description of his symptoms' intensity, persistence, and limiting effects was "not credible" compared to the longitudinal record. The ALJ applied too stringent a standard at step two when determining whether Canada's symptoms more than minimally affected his ability to perform basic work activities. *See* SSR 96-3p, at *2. At step four, however, the ALJ "provided a comprehensive list of reasons" with supporting references to the record for rejecting Canada's claim that the same symptoms are disabling. *Cooke*, 2014 WL 4567473, at *4.

For example, the ALJ correctly identified several instances where Canada expressly denied experiencing blurry vision, headaches, dizziness, fatigue, or weakness; failed to report those symptoms, or reported that he only experienced those symptoms when he didn't take his insulin. R. 18–19; *see also* R. 93, 304, 318, 347, 369, 372, 375–76, 419, 445, 523. This inconsistency alone supports the ALJ's finding that Canada's symptoms were not as severe as alleged. *See Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's adverse

credibility finding where he "cited specific contradictory testimony and evidence . . . and averred that the entire record had been reviewed"); *Sowers v. Colvin*, No. 4:12cv29, 2013 WL 3879682, at *4 (W.D. Va. July 26, 2013) (Kiser, J.) (claimant's inconsistent statements about his symptoms provided substantial support for ALJ's adverse credibility finding).

The ALJ also found that Canada repeatedly failed to take his insulin even though he enjoys "reasonably good health" when "compliant with [his] diabetic treatment." R. 18. Canada testified that he took his insulin except "at one time" when it was "making [his] sugar drop real bad." R. 37. Canada did tell Dr. Otero-Truitt that he was "not taking the prescribed amount of insulin" because it caused his blood sugar to drop too low in January 2012.[11] R. 523. But Canada's medical records document at least three occasions when he stopped taking insulin— with serious consequences—because he ran out several days earlier. R. 342, 347 (Dec. 2010); R. 315, 318, 321 (June 2011); R. 419 (Sept. 2011). In June 2011, Canada told physicians that he never contacted Med Assist and "didn't try" to refill his insulin when he ran out. R. 315, 318. Canada claims that he suffers debilitating hyperglycemic symptoms even though he takes his insulin as prescribed. It was not unreasonable for the ALJ to conclude that Canada's inconsistent statements about his noncompliance undermined his credibility. *Cf. United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.").

The ALJ also found that Canada had significant gaps in treatment after his January 1, 2010, alleged onset date. *See* R. 16, 18. "An unexplained inconsistency between the claimant's characterization of the severity of [his] condition and the treatment []he sought to alleviate that condition" can weigh against the claimant's credibility. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th

---

[11] Dr. Otero-Truitt increased Canada's insulin at this visit because his glucose levels were still too high. R. 525–26.

Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)). Canada apparently sought no healthcare at all for several months during the relevant period. *See, e.g.*, R. 247, 401 (Jan.–July 2010); R. 372, 346 (Aug.–Dec. 2010); R. 302, 305 (Dec. 2010–March 2011); R. 302, 321 (March–June 2011); R. 312–13, 419 (June–Sept. 2011); R. 420, 439 (Sept. 2011–Jan. 2012); R. 526, 38–39 (Jan.–Sept. 2012). When he did seek treatment, it was often because he stopped taking his insulin days or weeks before. *See, e.g.*, R. 321, 346. These unexplained inconsistencies undermine Canada's testimony that he suffers constant, debilitating hyperglycemic symptoms. *See Mickles*, 29 F.3d at 930; *Mabe v. Colvin*, 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) (Kiser, J.).

Finally, the ALJ found that none of Canada's doctors had "opined that [Canada] has any work-related limitations" from his diabetes or obesity. R. 20. Information that a treating or examining source provides about a claimant's symptoms is an important indicator of the intensity, persistence, and limiting effects of symptoms, such as fatigue, that can be difficult to quantify. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Thus, a provider's failure to impose "symptom-related functional limitations and restrictions" can weigh against the claimant's credibility. *Id.*; *Hicks v. Colvin*, No. 7:12cv618, 2014 WL 670916, at *6 (W.D. Va. Feb. 20, 2014) ("Finally—and significantly—the ALJ noted that the claimant's allegations of totally disabling symptoms were unsupported by any restriction placed on her by her treating physicians."). None of Canada's healthcare providers questioned, let alone restricted, his activity during the relevant period. On the contrary, several doctors instructed Canada to exercise and lose weight. *See* R. 339, 525–26. The ALJ's evaluation of Canada's credibility is reasonable, consistent with other findings, and fully supported by the record.

C.      *Canada's Ability to Work*

Canada suggests in passing that the ALJ should have included Canada's discredited "limitations" in his RFC determination. Pl. Br. 22. A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the [claimant's] record," including objective medical evidence, medical-source opinions, and the claimant's own statements. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam); *accord* SSR 96-8p, 1996 WL 374184 (July 2, 1996). The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. §§ 404.1545(e), 416.945(e). The claimant bears the burden of showing that an omitted limitation should have been included. *Lowery v. Comm'r of Soc. Sec.*, No. 4:10cv47, 2011 WL 2648470, at *4 (W.D. Va. June 29, 2011), *adopted by* 2011 WL 2836251 (July 14, 2011) (Kiser, J.).

The ALJ found that Canada could perform light work that did not involve "concentrated exposure to extreme heat and cold" or require climbing ladders, ropes, or scaffolds. R. 20. The ALJ did not fully explain why he included these restrictions in Canada's RFC. *See id.* Still, his decision demonstrates that he considered all of the relevant medical and other evidence when assessing Canada's RFC, as the regulations required him to do. *See* R. 16–20; *Johnson v. Astrue*, No. 6:11cv9, 2012 WL 2046939, at *3 (W.D. Va. June 5, 2012); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The record also "provides an adequate explanation of the Commissioner's decision" for this Court to determine whether substantial evidence supports the ALJ's underlying

21

factual findings, including his RFC determination. *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (brackets omitted).

"Light" work involves lifting no more than twenty pounds at a time, but frequently lifting or carrying objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can lift twenty pounds (and frequently lift ten pounds) can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays*, 907 F.2d at 1455 n.1. The ALJ found that Canada could meet these requirements based on all the relevant evidence available in October 2012. R. 20. This finding is supported by Canada's report that he can "lift at least 100 lbs and walk 1½ mile" at a time, R. 22, and by his normal physical and neurological exams throughout the relevant period, *see* R. 302–03, 318–19, 342, 348, 369–70, 372–73, 375–76, 419–20, 441, 442–43, 446, 459, 524–25. Canada does not argue otherwise. Thus, the credible evidence in the record does not establish more restrictive limitations than those the ALJ identified in the RFC.

The ALJ's reliance on the VE's testimony in response to a hypothetical reflecting this RFC, *see* R. 21–22, 69–70, was also proper.[12] *See Hines*, 453 F.3d at 566 (noting that a "proper" hypothetical must "fairly set out all of [the] claimant's impairments"). The VE testified that a person with Canada's vocational profile and this RFC could perform certain light jobs, such as custodian, production inspector, or hand packer. *See* R. 69–70. Canada does not object to the VE's testimony or to the ALJ's finding that these jobs exist in significant numbers nationally and in Virginia. I find that the Commissioner's final decision is supported by substantial evidence.

---

[12] The ALJ did not need to ask about Canada's alleged other limitations, Pl. Br. 22, because he reasonably decided not to include those restrictions in his RFC determination. *See Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) ("Because the ALJ's [RFC] determination is supported by substantial evidence and because the challenged hypothetical question merely incorporated that determination, the ALJ committed no error.").

*See Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (holding that a VE's reliable testimony provides substantial evidence to support the Commissioner's final decision).

V. Conclusion

This Court must affirm the Commissioner's final decision that Canada is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. Despite the ALJ's error at step two, the Commissioner has met both requirements. Accordingly, I recommend that the Court **DENY** Canada's motion for summary judgment, ECF No. 14, **GRANT** the Commissioner's motion for summary judgment, ECF No. 16, and **DISMISS** this case from the docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 18, 2015

Joel C. Hoppe
United States Magistrate Judge